DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CARLOS CADAVID,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D17-1224

[October 31, 2018]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Michael A. Robinson, Judge; L.T. Case No. 14-2113-CF10A.

Carey Haughwout, Public Defender, and Alan T. Lipson, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Anesha Worthy, Assistant Attorney General, West Palm Beach, for appellee.

FORST, J.

Appellant Carlos Cadavid ("the defendant") appeals from his conviction for first degree murder with a firearm. He argues that the trial court erred in prohibiting him from speaking to his attorney during a ten-minute recess between his direct and cross-examinations. The State concedes this error, but argues it was harmless under the circumstances. We agree with the State and affirm.[1]

## Background

The State indicted the defendant for the February 14, 2014 first degree murder of Krizia Nunez with a firearm.

---

[1] We also affirm with respect to the defendant's second argument, without comment.

The evidence at trial revealed the following. Around 3:30 a.m. on the morning in question, the defendant called 911 from the motel room where he and the victim were staying. He told the operator that his girlfriend had just shot herself with his gun. The defendant also told responding officers and the detective at the scene that the victim had shot herself. In the motel room, police found the victim lying on the floor and the defendant's firearm a few feet from her body. Police also found an unfired round in a shoe near the victim's feet, a spent shell casing on the nightstand under a pizza box, and two boxes of ammunition in a backpack next to the bed. Another cartridge was found in the victim's car. Crime lab analysis of these items, and the fragment recovered from the victim's body, revealed that they all matched to the defendant's firearm.

Over the defendant's objection, his videotaped police interview was played for the jury. At first during the interview, he maintained his story that the victim shot herself. He said that he and the victim had "popped Molly" and were supposed to go to Fort Lauderdale for his friend's birthday, but the victim started "acting up" and did not want to go out. They argued, and when the defendant told the victim he was done with her and leaving, the victim grabbed his gun off the bed and shot herself. Later in the interview, when confronted with physical evidence contradicting his story, the defendant admitted he shot and killed the victim. He claimed that voices coming from the TV were commanding him to kill the victim or she would kill him, so he pulled his gun from his holster and shot the victim. He explained to the detectives: "especially when you're on drugs like Molly . . . you start hallucinating." When asked about the unfired round found on the floor, the defendant explained that when he cocked the gun it was loaded so the cartridge fell on the floor. He then shot the victim.

The defendant told detectives he lied about the victim shooting herself at first because he feared prison. To support his story that the victim shot herself, he moved her body a bit and rubbed the gun on her hand. He thought about disposing of the body, but he could not find the victim's car keys. About a half hour after he shot the victim, he decided to call 911.

After the police interview was played for the jury, the defendant testified on his own behalf and gave a third version of the events that led to the victim's death. He admitted shooting the victim but, for the first time, claimed it was an accident. The two had known each other only a few days after meeting at a club. The night before the incident, they checked into a

2

motel, and both "ingested" methamphetamine[2] while driving to meet the defendant's friend at a lounge in Fort Lauderdale. Before they got to the lounge, the victim's demeanor changed and she insisted they return to the motel. The defendant had no choice because they were in the victim's car and she was driving. When they got back to the motel, the defendant smoked a joint. He was upset because he had wanted to stay out. He called his friend, who agreed to pick him up, but the defendant told the friend he would call him back. The victim did not want the defendant to leave and continued to act erratically. The defendant put his bag on the bed and started packing his things. His gun was on the end of the bed. The defendant said he had purchased the gun "for protection" a few weeks earlier. Two years before this incident, he had been shot in the right leg, and now has a prosthetic limb.

The defendant next testified that, at this point, the victim grabbed the defendant and asked him to stay. He pushed her away. She came at him again and he pushed her a little harder. The victim then "snapped," tried to slap the defendant and reached for his gun. He grabbed the gun from her hand. The victim then got on her knees and grabbed the defendant's leg. According to the defendant, as he took a step back, he "put pressure on [his] toe on [his] prosthetic it immediately fold[ed] so [he] went directly down and she was down there with [him]." The defendant said, "we both hit the ground but, you know what I'm saying, I think, I'm not sure if I hit the refrigerator or what but when I tried to catch myself I accidentally squeezed the trigger and the gun went off." The victim was lying face down and not moving, so the defendant shook her and tried to wake her up. Eventually, he called 911. The defendant lied to the 911 operator and responding officers about the victim shooting herself because he was scared and did not think the police would believe him if he told the truth.

At one point on direct, the defendant uttered, without prompting by his counsel: "I have never been in trouble before." The trial court immediately held a sidebar. The State argued the defendant had just opened the door to his prior arrests. The trial court told defense counsel "to clean it up because he just lied," otherwise the State could question him about the prior arrests. Defense counsel said he would "come back to it," but never did.

Regarding his second story to detectives, that voices from the TV told him to kill the victim, the defendant said he just made that up because

---

[2] The victim's toxicology report contained "unconfirmed positive" results for amphetamines or methamphetamine.

"[t]hey had me in there for so long that I was just like I'm going to give them what they want and just, I felt like I was blaming myself and I was like I was going to take it." His "mind was fried"; he was "[f]reestyling."

After the defendant's direct testimony, the court excused the jury for a 10-minute break, during which the following discussion took place:

> [DEFENSE COUNSEL]: . . . When we come back . . . Judge, I want to discuss that whole opening the door issue . . . .
>
> THE COURT: All right. Sir, don't talk to anyone at all, okay.
>
> THE DEFENDANT: Yes, Sir.
>
> THE COURT: If you need to go to the bathroom we'll take you to the bathroom. You may be seated. Have a seat. If you want to go to the bathroom that's fine. Don't talk to anybody.
>
> [DEFENSE COUNSEL]: Judge, in that respect would that not include his counsel thought [sic], I think –
>
> THE COURT: Not right now, no.
>
> [DEFENSE COUNSEL]: Specifically –
>
> THE COURT: Counsel, let me tell you something, . . . I took a break, I'm going to take a break, Cross-Examination is going to happen, basically you said that's enough and that's going to happen. I appreciate it.
>
> [DEFENSE COUNSEL]: But specifically –
>
> THE COURT: All right, 10 minutes. We're off the record.

After the short recess, the discussion resumed:

> [DEFENSE COUNSEL]: Judge, I want the record to be clear that I obeyed the Court's admonition not to speak to my client during this break. . . . And I would again object and ask the Court to allow me to speak to my client in the middle of his -- even though he is on the stand and it's in the middle he is about to do Cross-Examination I would like to consult with him privately at this time.

4

THE COURT: Well, that's up to the State. . . .

[STATE]: No. . . . I'm not stipulating to that.

THE COURT: I appreciate it. Thank you.

On cross-examination, the State never mentioned the prior arrests. The defendant did not dispute that his first two stories to police were lies, and agreed with the State on almost every question, generally confining his response to "Correct." He also agreed the detectives never threatened him or attempted to coerce him into making statements.

After cross-examination, the defendant unsuccessfully moved for a mistrial. Citing this court's opinion in *Mears v. State*, 183 So. 3d 1230 (Fla. 4th DCA 2016), the defense argued "it's fundamental error for a client not to be able to consult with his lawyer even when he is on the stand, even if he is in the middle of cross-examination." The State noted that it never went into the arrests issue, and the trial court agreed, stating: "The reason why you wanted to talk to your client was moot because he didn't do anything, he did not go into that issue."

The jury found the defendant guilty as charged and that he actually possessed and discharged a firearm resulting in death. The defendant moved for a new trial, arguing in part that the court erred by not granting a mistrial when it prohibited defense counsel from conferring with the defendant during the recess between direct and cross-examination. The court denied the motion and sentenced the defendant to life in prison with a twenty-five-year mandatory minimum sentence. This appeal followed.

### Analysis

The defendant argues the trial court reversibly erred in denying him an opportunity to consult with his counsel during the brief recess in-between the defendant's direct testimony and cross-examination. The State concedes error, but argues it was harmless in the context of the case. We agree with the State.

We reiterated in *Mears* that "a defendant has the right to consult with his attorney during a recess even if he is on the stand," and that:

> "[N]o matter how brief the recess, a defendant in a criminal proceeding must have access to his attorney. The right of a

5

criminal defendant to have reasonably effective attorney representation is absolute and is required at every essential step of the proceedings. *Although we understand the desirability of the imposed restriction on a witness or party who is on the witness stand, we find that to deny a defendant consultation with his attorney during any trial recess, even in the middle of his testimony, violates the defendant's basic right to counsel.*"

183 So. 3d at 1232 (quoting *Burgess v. State*, 117 So. 3d 889, 892-93 (Fla. 4th DCA 2013)). Indeed, "Florida law affords greater protection of a defendant's right to counsel than federal authority requires." *Id.* (quoting *Leerdam v. State*, 891 So. 2d 1046, 1049 (Fla. 2d DCA 2004)).

Because the State concedes error, the only issue on appeal with respect to this issue is whether the error was harmless. *See Bova v. State*, 410 So. 2d 1343, 1345 (Fla. 1982) ("[W]e disapprove the decision of the district court as to the attorney-client consultation issue, but, because we find the error harmless, approve the result."). "The error of denying access to counsel during a recess called immediately prior to cross-examination of the defendant has been found not to be harmless when the defendant's performance on cross-examination could have affected the verdict." *Leerdam*, 891 So. 2d at 1051 (citing *Thompson v. State*, 507 So. 2d 1074, 1075 (Fla. 1987)).

In this case, the defendant's performance on cross-examination could not have affected the verdict. While his credibility was at issue, on direct he opened the door to the fact that he had lied to police a *second* time about how the victim was shot. On cross, which was relatively brief (only 22 of 892 pages of transcript), his testimony was cumulative to his testimony on direct. The defendant did not dispute his lies, and agreed with the State on almost every question. While he disputed his level of sobriety during the police interview, he had already impeached himself on direct by stating that methamphetamine does not make him hallucinate, disoriented, or crazy, but "just levels [him] out" when his leg is bothering him. Moreover, the videotape of the interview—which depicts an alert, calm, coherent, and cooperative defendant—speaks for itself.

The defendant likens his case to *Thompson*, in which the Florida Supreme Court granted a new trial because "the [trial] court precluded the defendant from consulting with his counsel during recess." 507 So. 2d at 1074. *Thompson*, however, is distinguishable. In *Thompson*, the State "was granted a thirty-minute recess for the sole purpose of researching

6

ways to impeach [Thompson] regarding a subsequent arrest which his lawyer had apparently advised him would be inadmissible. Thus, Thompson was denied the guidance and support of his attorney when he needed it most (i.e., when the State was preparing for a major attack on his credibility)." *Id.* at 1075. The Court held that "Thompson's credibility was a crucial issue in his trial," and denial of consultation with counsel left Thompson "nervous [and] confused." *Id.*

Here, unlike in *Thompson*, the record does not reflect that the defendant was nervous or confused on the stand. Moreover, the apparent primary reason for defense counsel's request to consult with his client—the defendant's direct testimony that he had never been in trouble before, when in fact he had a prior arrest record—became moot, as the State never raised the matter on cross.

*Burgess* is similarly distinguishable, where "[t]he reason for the state's request for the recess was to determine whether it should ask for a mistrial due to a statement which the defendant made during his testimony," and "[p]rohibiting the defendant from speaking with his counsel during the recess deprived the defendant of counsel's advice as to whether to continue or abandon that line of testimony." 117 So. 3d at 893. Such circumstances did not exist here.

## Conclusion

There is no reasonable possibility that the trial court's refusal to allow the defendant to speak to his counsel during the short break impacted the jury's verdict in this case. *See State v. DiGuilio*, 491 So. 2d 1129, 1138-39 (Fla. 1986). Accordingly, we hold that the error was harmless, and we affirm the judgment of conviction.

*Affirmed.*

WARNER and MAY, JJ., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***